# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
February 17, 2021 Session

## JENNIFER CLARKE, ET AL v. CITY OF FRANKLIN

**Appeal from the Chancery Court for Williamson County**
**No. 94CHI-2012-CV-40851      James G. Martin, III, Judge**

_____

### No. M2020-00662-COA-R3-CV
_____

This appeal arises from a class action lawsuit against the City of Franklin. The plaintiffs are the owners of 188 properties, in five subdivisions, whose properties are subject to liens in connection with improvement assessments for sanitary sewer services. The trial court granted partial summary judgment in favor of the plaintiffs, concluding that the City had filed notices of liens against the properties in amounts greater than authorized pursuant to the relevant statutes governing improvement assessments. The trial court declared the notices of liens null and void and directed the City to file amended notices of liens. The next phase of the proceeding focused on damages. The owners of eight properties filed claims for monetary damages allegedly caused by the City's error when the property owners had attempted to refinance or sell their properties. The trial court concluded that a hearing on damages was not necessary and denied all claims, finding that none of the claimants suffered an injury as a result of the City's actions. The trial court also denied the plaintiffs' request for an award of the attorney fees they had incurred. The plaintiffs appeal, asserting that the trial court erred in denying their claims for damages and attorney fees. The City of Franklin argues that the trial court erred in granting partial summary judgment in favor of the plaintiffs on the substantive issue regarding the validity of the notices of liens. For the following reasons, we affirm in part, reverse in part, vacate in part, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part, Vacated in Part, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY W. ARMSTRONG, J., joined.

J. Gerard Stranch, IV, and Benjamin A. Gastel, Nashville, Tennessee, for the appellants, Jennifer Clarke and Samuel Clarke.

Shauna R. Billingsley, City Attorney, and William E. Squires, Assistant City Attorney, Franklin, Tennessee, for the appellee, City of Franklin, Tennessee.

## OPINION

### I.    FACTS & PROCEDURAL HISTORY

The City of Franklin is an incorporated municipality located in Williamson County, Tennessee.  The City is governed by a mayor and board of aldermen.  Beginning in 2009, the City passed a series of ordinances and resolutions attempting to recoup the cost of sanitary sewer improvements for various subdivisions in accordance with Tennessee Code Annotated section 7-33-301, *et seq*.

A brief overview of the detailed statutory scheme is helpful at the outset.  Tennessee Code Annotated section 7-33-302(a) provides that "[m]unicipalities are authorized to provide for, construct, and finance improvements defined in § 7-33-301 according to the plan set forth in this part."  The statutory scheme includes the following definition:

> "Improvement assessment" means an assessment made *each year* against benefited property to pay the costs of an improvement, in the proportion that the assessed value of each parcel or lot of benefited property bears to the total assessed value of all benefited property according to the latest assessments of such property for purposes of municipal property taxation or as provided by this part[.]

Tenn. Code Ann. § 7-33-301(6) (emphasis added).  Likewise, Tennessee Code Annotated section 7-33-310(a) provides, in pertinent part:

> Improvement assessments shall be assessed *annually* against the benefited property in the proportion that the assessed value of each lot or parcel bears to the whole assessed value of the benefited properties. . . . .

(emphasis added).  The statutory scheme further provides:

> The governing body by resolution may authorize properties other than the properties originally benefited by an improvement to receive the benefits of the improvement, and may make equitable provisions, which may be adjusted from year to year as bonds are retired, whereby the owners of such later benefited properties will assume a fair proportionate share of the improvement assessments, or otherwise be placed as nearly as practicable on a basis of financial equity with the owners of properties initially subject to the improvement assessments.

Tenn. Code Ann. § 7-33-311. The timing of the assessment is to occur as follows:

> *Annual* improvement assessments for each improvement shall be made by the governing body when the levy of municipal property taxes is made; and such improvement assessments shall be due at the same time, or times, the municipal property taxes are due, and shall be subject to the same penalties and accrual of interest in the event of nonpayment as in the case of municipal property taxes. The governing body may permit owners of benefited property to pay improvement assessments in equal monthly installments, the first installment to be due and payable when the improvement assessment is due; in this event any monthly payment shall be delinquent thirty (30) days after it is due and payable, and the whole balance of the *annual* improvement assessment shall then become delinquent and be subject to all penalties and interest as provided in this part.

Tenn. Code Ann. § 7-33-313 (emphasis added). Finally, the governing statutes provide for liens associated with the improvement assessments:

> Each improvement assessment, with any penalty or interest incident to the nonpayment of the assessment, shall constitute a lien upon the lot or parcel of benefited property against which it is assessed. The lien shall attach to each lot or parcel of benefited property at the time the *annual* improvement assessment is made, and then shall take precedence over all other liens, whether created prior to or subsequent to the making of such improvement assessment, except state, county and municipal property taxes, and prior special assessments. . . .

Tenn. Code Ann. § 7-33-314 (emphasis added).

On May 26, 2009, the City passed the first of the resolutions and ordinances at issue. This resolution established an improvement assessment for the Highgate Subdivision. It provided that the sanitary sewer improvements for the Highgate Subdivision had been completed at a cost of $204,586.50. The resolution then calculated, for each of the benefited properties in the subdivision, a "Total Assessment" that would be owed by each property. The "Total Assessment" for each property varied, but the highest for any single property was $9,844. The resolution then designated the "Total Assessments" as "the 2009 Highgate Subdivision Area property assessments." The resolution then provided:

> BE IT FURTHER RESOLVED by the Board of Mayor and Aldermen that, although the above property assessment for each property within the Special Assessment District is due February 28, 2010, Resolution 2008-21 has established the right of the property owners to pay off their assessment

in monthly installments over a ten (10) year term, but such that, if any monthly payment shall become delinquent thirty (30) days after it is due and payable, then the whole balance of the improvement assessment shall become delinquent and be subject to all penalties and interest as provided.

The Highgate resolution never mentioned Tennessee Code Annotated section 7-33-301, *et seq*. Nevertheless, the City claims that the resolution was passed under the authority of these statutes.

Two months later, the City passed a separate resolution for the Hooper Lane Subdivision. This time, the resolution specifically invoked Tennessee Code Annotated sections 7-33-101 to 314 and closely tracked the language of many of the applicable statutes. The Hooper Lane resolution did not calculate any "total assessment" amounts that would be owed by each property. Instead, the Hooper Lane resolution listed only the total estimated cost of the sanitary sewer improvement for the entire subdivision, and it provided that one hundred percent of the cost of the improvement would be assessed against the benefited properties. The resolution listed the parcel numbers of the benefited properties and stated that the Board may authorize the addition of other properties at a later date, with any later-added properties bearing their proportional share of the costs of the improvements. The resolution stated that the benefited property owners would pay off the total assessments authorized by the resolution over a term of ten years. However, it expressly stated that "improvement assessments shall be assessed annually against the benefited property in the proportion that the assessed value of each lot or parcel bears to the whole assessed value of the benefited properties, pursuant to T.C.A. §§ 7-33-310 to 314." In accordance with the applicable statutes, the resolution provided that "[i]mprovement assessments shall be made annually by the Board when the levy of municipal property taxes is made and *such assessments shall be due at the same time or times as the municipal property taxes are due*, and shall be subject to the same penalties and interest, in the event of nonpayment, as are municipal property taxes." (emphasis added). Notably, the Hooper Lane resolution further provided that "[a]n unpaid *annual* assessment, with penalty and interest, shall constitute a lien against the property, lot, or parcel against which it is assessed, shall attach as of the date the improvement assessment is made, and shall take precedence over all other liens, save those for state, county, and municipal property taxes, and any prior special assessments." (emphasis added).

Thereafter, the City passed three ordinances addressing three additional subdivisions: Country Road Estates Subdivision, Boyd Mill Avenue Area, and Monticello Subdivision. Like the Hooper Lane resolution, each of these ordinances specifically invoked and tracked the language of Tennessee Code Annotated sections 7-33-101 to 314. The ordinances for the Country Road Estates Subdivision, the Boyd Mill Avenue Area, and the Monticello Subdivision all provided that the benefited property owners were given twenty years to pay off the assessments authorized by the ordinances. However, all of the ordinances specifically provided that "[i]mprovement assessments shall be made annually

by the Board when the levy of municipal property taxes is made and such assessments shall be due at the same time or times as the municipal property taxes are due, and shall be subject to the same penalties and interest, in the event of nonpayment, as are municipal property taxes."

Despite the marked differences between the language in the Highgate resolution and the four resolutions and ordinances that followed, the City implemented them all in the same manner, using the approach described in the Highgate resolution. The resolutions and ordinances were all drafted by the city engineer for the City of Franklin, who was not an attorney. He was of the opinion that there was "no difference" between the resolutions and ordinances as far as the way they were established or how they operated.

In all, there were 188 properties in the subdivisions that were benefited by the sanitary sewer improvements. For each benefited property, the City filed a "Notice of Lien" with the Register of Deeds, stating that the City had a lien against that property in the full amount of the total assessment that would be owed by each property over the life of the repayment period, according to the initial calculations of the City, not just the amount that would be due annually. The parties agree that the City was not required to file any notices of the liens because the liens attach automatically pursuant to the statute. *See* Tenn. Code Ann. § 7-33-314 ("The lien shall attach to each lot or parcel of benefited property at the time the annual improvement assessment is made . . . ."). The City claims that it made a business decision to file the notices of liens in order to notify potential purchasers of the benefited properties and any other lienholders about the City's lien.

Jennifer and Samuel Clarke own one of the benefited properties in the Monticello Subdivision. On April 11, 2012, the Clarkes filed this class action lawsuit against the City. The Clarkes alleged that despite their payment of all amounts due annually, the City had wrongfully registered liens for the entire amount that would be assigned to each property for the total assessments. The Clarkes alleged that "[a]s a result of this filing," they and other property owners were unable to sell, refinance, or transfer their properties without payment of the entire assessment amount. According to the complaint, the plaintiffs had demanded that the City remove the lien for the full amount, but the City refused. The complaint alleged that the plaintiffs were suffering irreparable injury in that the liens prevented the sale, refinancing, or transfer of their properties without payment of the full assessment amounts calculated by the City.

The complaint proposed that the class of plaintiffs include all current and former owners of the affected properties against which the City had recorded notices of liens for the total amounts of the assessments for sanitary sewer improvements. The two proposed subclasses would include those who had not yet suffered monetary damages but needed injunctive relief to avoid suffering damages, and those who had already suffered monetary damages in connection with a completed or attempted sale, refinancing, or transfer of title because of the outstanding liens.

Essentially, the complaint alleged that the City had obtained illegal liens "through" its assessments. It requested a declaratory judgment that any lien against the benefited properties was limited to the amounts of *annual* assessments. The plaintiffs pointed out that the City was purportedly acting pursuant to Tennessee Code Annotated sections 7-33-101 through 314. The plaintiffs quoted numerous statutes within that statutory scheme in an effort to demonstrate that improvement assessments are to be made "each year" and "assessed annually," with the liens attaching "at the time the annual improvement assessment is made." *See* Tenn. Code Ann. §§ 7-33-301, -310, -314. The plaintiffs asserted that the ordinance addressing the Monticello Subdivision likewise provided that the assessments were to be made *annually* and concurrent with the levy of municipal property taxes. Thus, the plaintiffs alleged that the City "cannot attach a lien on property for which future annual assessments have not yet been made, and is therefore prevented from imposing a lien on a property for the full amount of the special assessment." The plaintiffs alleged that the City had effectively registered notices of liens "for 20 years of annual installments." They alleged that the City's actions were illegal and ultra vires, going "beyond the powers granted the City as provided in T.C.A. § 7-33-301, *et seq.*" They sought a declaratory judgment to that effect and an injunction prohibiting the City from maintaining liens in the full amounts of the assessments, lifting the liens already imposed by the City, and limiting any future liens to annual liens authorized by the statutes. They also sought monetary damages for class members who had suffered economic loss as a result of their inability to sell or refinance existing mortgages on the properties due to the liens. The plaintiffs also sought an award of their attorney fees.

The City filed an answer and a motion to dismiss, which the trial court denied. The plaintiffs then filed a motion for class certification, claiming that the City had imposed liens on all of the properties using the same criteria. Specifically, they alleged that the unlawful liens were for special sewer assessments that were not yet due under the applicable statutes. They claimed that the liens should be for hundreds of dollars but that the City was generally imposing liens of at least $6,000 per property. The plaintiffs attached to their motion "summary charts" that were produced by the City listing precise amounts that the City had calculated would be owed by each benefited property in each subdivision. Some of these charts specifically stated that the "initial assessment" calculated by the City was due in full if the property was sold and that the assessment obligation was not transferrable, assignable, or assumable. Others stated that the assessment obligation must be "paid in full if ownership changes." The charts stated that the City had filed liens to protect the City's investment. The charts also reflected that the City's annual calculations appeared to be simply recalculations of the total amount the City initially assigned to each property owner. For instance, one property owner had a "2010 Assessment" of $13,856.31 and a "2011 Assessment" of $13,249.57. The plaintiffs claimed they were seeking "an order establishing that [the] City's lien program is unlawful and establishing that [the] City may only impose liens for amounts actually due and owing under its lien program." They asked the court to "direct [the] City to operate its special

- 6 -

assessment process differently, as required by law." They also submitted deposition testimony in support of their motion.

In response to the motion for class certification, the City insisted that there were some material differences in the ordinances and resolutions, and therefore, the motion should be denied or the class should be limited to a particular subdivision. The City filed numerous documents as well, including an example of a "Notice of Lien" it had filed for one specific property. In apparent conflict with the aforementioned language barring any assignment or transfer, the Notice of Lien stated that the lien would run with the land:

> As authorized by Tennessee Code Annotated § 7-33-314, A lien in the amount of SIX THOUSAND EIGHT HUNDRED FIFTY NINE AND 04/100 DOLLARS ($6,859.04), and second only to liens of the state, county and municipality for taxes, and any prior special assessment, is imposed and established on the following property for the public sanitary sewer improvements by the City of Franklin, Tennessee. This amount shall be paid off over a term of twenty (20) years and will decrease as payments are made. The lien shall be released upon satisfaction of the entire amount and shall run with the land.

After a hearing, the trial court entered an order granting the motion for class certification. The trial court found that all of the plaintiffs' claims arose from the same practice and course of conduct – the City's creation of special assessment districts and filing of disputed liens. It found that the City had filed notices of liens against all of the properties for the total amounts of the assessment assigned to each property, equaling thousands of dollars for the overwhelming majority of the properties. Thus, the trial court found that the controversy turned on one core legal issue common to all of the class members – whether the disputed liens were legal or illegal. The trial court reasoned that "in one stroke" it could declare the proper operation of the improvement assessment statutes and thereby resolve the claims of every class member. As such, it certified the class to include all property owners whose affected properties were being or had been subject to the disputed liens.

The parties filed cross-motions for summary judgment and "Joint Stipulations of Fact" to aid the court in resolving the motions. The parties stipulated that for all 188 properties, the City filed notices of liens in the amount of the total assessment that would be owed by each property and not the amount due annually. They stipulated that the City "reviews" the assessments each year to account for any fluctuations in the proportional shares of the properties that have not yet paid the amounts due in full. The parties attached to their stipulations the various resolutions and ordinances for each subdivision.

Based on the undisputed facts, the City moved for summary judgment, claiming that it had properly interpreted and implemented Tennessee Code Annotated section 7-33-301, *et seq*. The City confirmed that its practice was to initially calculate the improvement

assessment owed for each property and then conduct "subsequent annual reassessments" to determine if those amounts had changed. In other words, the City's initial calculation was reviewed each year to account for any fluctuations in value amongst the properties and to require any later-added properties to assume their share of the total amount. However, the City took the position that there was "no distinction" between a "total assessment" and an "annual assessment." The City sent letters to each of the benefited properties, from the City's engineering supervisor, informing the homeowners of their total "individual property assessment" amount.[1]

The City further explained the basis for its interpretation of the statutes. As previously noted, the relevant statutes define an improvement assessment as follows:

> "Improvement assessment" means an assessment made each year against benefited property to pay the costs of an improvement, in the proportion that the assessed value of each parcel or lot of benefited property bears to the *total assessed value of all benefited property* according to the latest assessments of such property for purposes of municipal property taxation or as provided by this part[.]

Tenn. Code Ann. § 7-33-301(6) (emphasis added). Based on the statute's reference to "total assessed value," the City interpreted the statute to mean that an improvement assessment is for the "costs of the improvement" for the "total assessed value of all benefitted property," and not a yearly amount. Stated differently, the City believed its liens extended to the "total assessed value," meaning total *assessment*. The City claimed that its interpretation was further supported by section 7-33-310 and its reference to "the whole assessed value." Read in context, the statute states, "Improvement assessments shall be assessed annually against the benefited property in the proportion that the assessed value of each lot or parcel bears to the *whole assessed value* of the benefited properties." Tenn.

---

[1] For example, one such letter to a homeowner stated:

Ordinance 2010-80 passed as amended by the [Board of Mayor and Aldermen] at the March 8, 2011 Regular Board Meeting. I want to take this opportunity to provide directly to you your individual property assessment. The assessment for your property has been calculated to be $8,009.16 based on the proportion of your property's assessed value to the total assessed value of all the benefitted properties within the District.

The City has chosen to allow payment of the property assessment over a term of twenty (20) years based on an annual interest rate of 4.0%. Therefore, should you so desire, you may pay your property's calculated assessment in equal monthly installments of $48.53. This monthly payment includes both principal and interest. Please Note: if the loan is repaid in full prior to September 15th, 2011 then all payments received by the City of Franklin will be applied to principal. . . . It is important to understand that the assessment will be reevaluated and assessed each year to allow for any increase in any of the properties' values and/or the addition of any properties to the assessment district.

Code Ann. § 7-33-310(a) (emphasis added). According to the City, "the Improvement Assessment is, by statute, based on the 'whole assessed value' and the 'total assessed value,'" and "not a portion or yearly portion of the costs of improvement or total value." To illustrate, the City explained that if a subdivision is subject to a twenty-year payoff term, "[w]hen the City reassesses annually it is not for Plaintiffs' 1/20 of the whole and total assessed value but rather their proportional share of the whole and total assessed value as provided by statute." According to the City, when its initial improvement assessment is "reassessed annually," this means that "the amount is adjusted annually based on the changes in each Benefited Property's proportional share of the *total value of all Benefited Properties.*" Thus, from the City's perspective, there was "no distinction" between a "total assessment" and an "annual assessment" but "simply the Improvement Assessment," based on the "total assessed value." Both the initial assessment and the subsequent annual reassessments were to determine what each benefitted property owed for the "whole assessed value," according to the City. The initial assessment was reviewed to account for fluctuations but "then recalculated for the 'whole assessed value.'" Through the use of "tags," the City noted that its use of the term "Assessment" throughout its motion meant "Total Assessed Value."

Relying on the statute that specifically addresses liens, the City further argued that the lien attaches at the time the improvement assessment is "made." *See* Tenn. Code Ann. § 7-33-314 ("The lien shall attach . . . at the time the annual improvement assessment is made[.]"). The City interpreted this to mean "when the first assessment is *made*," meaning "the day each ordinance or resolution, as the case may be, was passed." The City alleged that the liens were automatic but that it filed notices of liens, in its discretion, in an effort to place future home buyers or lienholders on notice of the City's lien. Based on its interpretation of the assessment, the City argued that the lien is to be "in the total amount of the home owners' proportionate improvement assessment." It argued that this interpretation made sense because in the event that a property owner was delinquent on his or her monthly payments, then "the whole balance" of the improvement assessment would be delinquent and owing. Thus, the City reasoned that its lien should likewise extend to the full amount. In sum, according to the City, the legislature had provided municipalities with the option of accepting monthly payments, but that did not change the facts that "the full amount" could be collected upon default and the lien was for "the full amount."

The plaintiffs filed a motion for partial summary judgment, addressing the issues of statutory interpretation but excluding the issue of damages. The plaintiffs sought an order declaring that the City's "lien program related to its special assessment districts" violated Tennessee Code Annotated section 7-33-314. They defined the issue as whether the City violated the statute by filing liens against the properties in the full amount of "initial improvement assessments instead of the annual amounts due and owing each year." According to the plaintiffs, the City's "lien program" was in clear violation of the statutes. They argued that the City was only allowed to obtain *annual* liens against the properties for the *annual* amounts of assessments. They relied on section 7-33-310(a) which states

that "[i]mprovement assessments shall be assessed annually" and section 7-33-301(6) which defines an improvement assessment as "an assessment made each year." Thus, the plaintiffs asserted that "the entire structure of Title 7, Chapter 33, Part 3 is centered around the concept of improvement assessments being made, and accordingly being liened, on an *annual* basis[.]" They suggested that the amounts that would be owed by any given homeowner in a twenty-year period were uncertain on the front end due to the possibilities of parcels being subdivided, homes being destroyed, property values changing, etc. Thus, the plaintiffs suggested that the City was imposing liens for amounts that the homeowners may not ultimately owe.

The plaintiffs disputed the City's position that the lien attaches when the assessment is "made" by the resolution or ordinance, noting that the applicable statute specifically states, "The lien shall attach to each lot or parcel of benefited property at the time the *annual* improvement assessment is made[.]" Tenn. Code Ann. § 7-33-314 (emphasis added). The plaintiffs agreed that the lien itself was created by operation of law and that the City's "Notice of Lien" was not required by the statutory scheme. However, the plaintiffs asserted that once the City filed the notices of liens, for the full amount of the assessments, the effect was that the homeowners were required to pay off the total assessment amounts listed in the notices of liens in order to sell, transfer, or refinance their homes. In sum, the plaintiffs argued that the City's lien program related to its special assessment districts violated the governing statutes, and they sought declaratory and injunctive relief to that effect.

After a hearing on the cross-motions, the trial court entered an order granting partial summary judgment to the plaintiffs and denying the City's motion for summary judgment. The trial court concluded that the City violated section 7-33-314 by filing notices of liens in the full amount of the assessments assigned to each benefitted property rather than the amount of annual assessments. The trial court found that the statutes clearly limited the lien to the amount due annually and that the lien did not extend to any full amount. Thus, the trial court concluded that the City violated the statute by filing *notices of liens* in full amounts because the *liens* were not for the full amounts but only for the annual amounts due in any given year. The court pointed out that section 7-33-310, which empowers municipalities to impose the assessments, "only authorizes annual assessments." It also noted the definition of an improvement assessment as "an assessment made each year." *See* Tenn. Code Ann. § 7-33-301(6). The court acknowledged the City's position that there is no distinction between the total assessment and the annual assessment but found no support for this interpretation in Title 7, Chapter 33, Part 3. Quite simply, the court concluded that "the Assessments are to be annual assessments." The trial court also rejected the City's reasoning that in the event of a default, the entire balance would be due and owing, as the applicable statute specifically stated that "the whole balance of the *annual* improvement assessment shall then become delinquent[.]" Tenn. Code Ann. § 7-33-313 (emphasis added). The trial court pointed out that section 7-33-314 provides, "The lien shall attach to each lot or parcel of benefited property at the time the annual

- 10 -

improvement assessment is made, *and then* shall take precedence over all other liens." (emphasis added). The trial court found that the City did not have a lien for any full amount because the amount owed changes annually, "the full amount is not due and owing," and the City does not know the amount to be paid over the life of the repayment period. According to the order, the City conceded that it had been forced to file at least one updated notice of lien for a property based on significant changes to its proportional share.

In sum, the trial court concluded that "the lien is for the annual amounts due and owing, and therefore the City had no authority to file notices of liens in the full amount of the Assessment." Thus, the trial court entered a declaratory judgment in favor of the plaintiffs on counts one and two of their complaint. The trial court declared the City's notices of liens null and void. It reserved ruling on additional remedies such as damages. In a later order, the City was ordered to file amended notices of liens referencing the trial court's ruling and directing anyone interested in determining the amount of the lien to contact the City. The City was directed to inform interested parties "that the City of Franklin's liens related to the Special Assessment are only in the amount of the annual assessments, and not the full amount of the Special Assessment."[2]

The City requested permission to seek an interlocutory appeal to this Court, which the trial court granted, noting that no caselaw existed regarding Title 7, Chapter 33, Part 3 of the Tennessee Code. However, this Court denied the application for an interlocutory appeal. After some delay and a failed attempt at mediation, the plaintiffs filed a motion asking the trial court to issue a class notice to the affected property owners who were "subject to the Disputed Lien program" regarding the process for filing petitions for damages. They explained that the damage claims would generally fall into two categories: (a) property owners who had paid off the full amount of the City's total special assessment in order to refinance or transfer their properties; and (2) property owners whose refinance or transfer was denied as a result of the incorrectly filed liens. The plaintiffs also sought the appointment of a special master. After a hearing, the trial court denied the request for appointment of a special master but granted the motion regarding the class notice. After receiving forms from those claimants who sought damages, the parties entered into an agreed order stating that the trial court would hold an evidentiary hearing on the disputed claims. Eight claims were ultimately submitted as needing to be adjudicated by the court. All of these claimants had either completed or attempted a sale or refinance and claimed damages as a result of the lien filed by the City related to the special assessment.

By way of example, the Clarkes claimed that they had attempted to refinance their mortgage in 2012, but when the bank conducted a title search and discovered the City's lien for $7,686.01, it required the Clarkes to pay off the entire lien before closing to ensure

---

[2] The amended notice for the Clarkes stated that the previously filed "Notice of Lien" had been declared invalid, that the property owners had paid the 2014 annual assessment in full, and that the lien for the 2014 annual assessment had been released.

that the bank had a first lien and enable it to obtain title insurance. The Clarkes claimed that the bank required them to bring enough funds to closing to pay off the full amount of the lien and that their refinance was denied because of a lack of "sufficient funds to close." Thus, the Clarkes claimed $7,374.53 in damages, which was the difference between what they would have paid under the proposed refinance and what they paid with their existing payments after the denial.

Both parties filed briefs regarding the claims for damages. On August 14, 2019, an agreed order was entered setting an evidentiary hearing on the disputed claims for October 17. One week before the scheduled evidentiary hearing, a "Joint Stipulation" was entered stating that "[c]onsistent with this Court's order on [the] remaining damages claims," the parties stipulated to the authenticity and admissibility of all evidence in their briefs and stipulated that the judge could decide all damage claims based on the factual record presented in the briefs. The trial court entered an order resolving the damage claims on December 19, 2019. That order states that "[a]fter reviewing the parties' briefs and conducting a conference call with the parties, the Court concluded that a damages hearing was not needed and rules as set forth in this Memorandum and Order." The trial court concluded that "none of the 8 claimants had suffered an injury as a result of the City's filing notices of liens for an improper amount."

For instance, with respect to the Clarkes, the trial court acknowledged that a letter from their bank denied their refinance application due to a lack of sufficient funds to close. Still, the trial court concluded that their claim should be denied because "[t]he cause of injury, if any, stems from [their] Bank's requirement that the lien be paid in full prior to refinancing, not from the City's notice of lien filing for an improper amount." For other plaintiffs, the trial court similarly concluded that they had failed to show how the improper "notice of lien filing" caused their damages. The trial court concluded that "none of the 8 claimants suffered an injury as a result of the City's actions." Thus, all claims for damages were denied.

The plaintiffs subsequently filed a motion for attorney fees in the amount of $250,572.50. They argued that such an award was appropriate because they had conferred a substantial benefit on the members of an ascertainable class within the meaning of *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970). The City filed a response, arguing that the substantial benefit doctrine has only been applied in Tennessee in very limited circumstances and that no substantial benefit was obtained in this case. After a hearing, the trial court entered an order denying the plaintiffs' request for attorney fees on the bases that the substantial benefit doctrine did not apply and the award would be barred by sovereign immunity. The plaintiffs timely filed a notice of appeal.

## II.  ISSUES PRESENTED

The plaintiffs present the following issues, which we have slightly reworded, for

review on appeal:

1.     Did the trial court err in denying the claims for monetary damages where the plaintiffs provided proof of damages and would not have incurred damages but for the City's illegal liens;

2.     Did the trial court err in denying the claim for attorney fees where the litigation conferred a substantial benefit on an ascertainable class and the award was not barred by sovereign immunity.

In its posture as appellee, the City presents the following additional issue, also restated:

1.     Did the trial court err in determining that the City's notices of liens were illegal where the City filed the notices in the amount of improvement assessments for each plaintiff's proportionate share of the cost of the sewer improvement and Tennessee law provides that the City's improvement assessment constitutes a lien on each property.

For the following reasons, the decision of the chancery court is affirmed in part, reversed in part, vacated in part, and remanded for further proceedings.

### III.   DISCUSSION

#### A.   *Partial Summary Judgment*

On appeal, we begin with the City's argument that the trial court erred by entering partial summary judgment in favor of the plaintiffs. The City maintains that its notices of liens were not illegal because the statutory scheme authorized the City to impose assessments for the improvement costs, and the City claims that it properly calculated those assessments as the improvement costs divided amongst all benefited property owners in their proportionate shares. The City contends that its notices of liens properly reflected "the full amount of the property owner's indebtedness." The City admits that "the initial assessment amount is not carved in stone and may change from year to year due to necessary adjustments." Still, the City maintains that it properly calculated an "initial assessment" followed by annual reassessments. According to the City, "the fact that the assessed amount is recalculated annually does not reduce or otherwise change the amount of the assessment encumbrance upon the benefitted properties, except as the owners may have paid down their assessment or as their *pro rata* proportion of improvement costs may change by the addition of more benefitted properties." The City claims that the benefited property owners acquire "the total amount of indebtedness . . . at the time of the initial assessment," resulting in "overall" encumbrances on their properties.

"'When statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would extend

the meaning of the language[.]'" *Coffman v. Armstrong Int'l, Inc.*, 615 S.W.3d 888, 894 (Tenn. 2021) (quoting *Carter v. Bell*, 279 S.W.3d 560, 564 (Tenn. 2009); *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004)). Like the trial court, we conclude that the City's interpretation is not supported by the plain language of the statutes. The statutes define an "[a]ssessed value basis" as "the plan for making annual improvement assessments according to the assessed values of benefited properties, as assessed for purposes of municipal property taxation, or as provided by this part. Such assessed values shall be the measure of benefits to benefited property or property to be benefited[.]" Tenn. Code Ann. § 7-33-301(1). It then defines an "[i]mprovement assessment" to mean "an assessment made each year against benefited property to pay the costs of an improvement, in the proportion that the assessed value of each parcel or lot of benefited property bears to the total assessed value of all benefited property according to the latest assessments of such property for purposes of municipal property taxation or as provided by this part." *Id.* at -301(6). According to the statute, "[i]mprovement assessments shall be assessed annually[.]" Tenn. Code Ann. § 7-33-310(a). So, by definition, an improvement assessment is an annual improvement assessment. The statutes simply do not contemplate one all-controlling "initial assessment" of the total amount to be owed over the repayment period, with subsequent "reassessments" of the total but immediate "indebtedness." The annual improvement assessment is not simply a recalculation of a total amount owed over the life of the repayment period. The unequivocal language of section 7-33-313, regarding the timing of the assessments, bears repeating:

> Annual improvement assessments for each improvement shall be made by the governing body when the levy of municipal property taxes is made; and *such improvement assessments shall be due* at the same time, or times, the municipal property taxes are due, and shall be subject to the same penalties and accrual of interest in the event of nonpayment as in the case of municipal property taxes. The governing body may permit owners of benefited property to pay improvement assessments in equal monthly installments, the first installment to be due and payable when the improvement assessment is due; in this event any monthly payment shall be delinquent thirty (30) days after it is due and payable, and the whole balance of the annual improvement assessment shall then become delinquent and be subject to all penalties and interest as provided in this part.

Tenn. Code Ann. § 7-33-313 (emphasis added). Simply put, annual improvement assessments are due at the same time as municipal property taxes. We find no support for the City's position that an "initial assessment" and indebtedness is fully due and owing as soon as the resolution or ordinance is passed. In the event that property owners pay *annual* improvement assessments in monthly installments, the whole balance of the *annual* improvement assessment may be deemed delinquent in the case of nonpayment. *See id.* However, the entire amount is not due at the outset. We also note that the only resolution providing for a "total assessment" in this manner was the first-in-time Highgate resolution

- 14 -

(but even it provided for a ten-year repayment term with payments "due and payable" on a monthly basis). All of the remaining resolutions and ordinances specifically provided for annual improvement assessments in accordance with the language of Tennessee Code Annotated section 7-33-301, *et seq.*[3]

On appeal, the City has shifted its argument to rely on a different statute, Tennessee Code Annotated section 7-33-303. The statute provides, in pertinent part:

> When the governing body of a municipality shall determine to construct an improvement as authorized by this part, or when it is petitioned by the owners of property to be benefited having an assessed value of at least fifty-one percent (51%) of the total assessed value of all the property to be benefited from the proposed improvement, it shall adopt a resolution that such improvement shall be made. The resolution shall describe the geographical limits of the properties to be benefited, and the location, nature, scope and extent of the improvement. The resolution shall also include a preliminary estimate of the costs prepared by an engineer licensed by the state of Tennessee, a declaration that the improvement will be designed and construction will be supervised by an engineer licensed by the state of Tennessee, and a statement of the proportion of total costs to be assessed against benefited properties, which shall not exceed seventy-five percent (75%) of the total costs of the improvement; provided, that *the total costs may be assessed against benefited properties* if the governing body additionally pledges full faith and credit of the municipality to satisfy any deficiency in collections of improvement assessments. In all succeeding proceedings, the municipality shall be bound and limited by the resolution as it may be amended, except that the total costs assessed against benefited properties may exceed the preliminary estimate of costs by not more than ten percent (10%).

Tenn. Code Ann. § 7-33-303(a) (emphasis added). On appeal, the City argues that this statute "establishes the process" by which a city may recoup the costs of improvements. The City argues that this statute allows it to recoup one hundred percent of "the total costs" of the improvement under certain circumstances. We do not disagree with the assertion

---

[3] Interestingly enough, the record contains a separate resolution addressing the Highgate Subdivision ("Resolution 2008-21") that does track the language of Tennessee Code Annotated section 7-33-301, *et seq.*, and it specifically provides that "improvement assessments shall be assessed annually," like the other ordinances and resolutions. The copy in the record is not signed. However, it appears that it was passed in some form because the Highgate resolution that we have been referencing in this opinion refers to "Resolution 2008-21" by name and states that it was passed by the Board of Mayor and Alderman. It also states that Resolution 2008-21 "established the right of the property owners to pay their assessment in monthly installments over a ten (10) year term." A chart prepared by the City also states that the Highgate assessment district was approved by Resolution 2008-21.

that the City can ultimately assess the total cost of the improvement against the benefited properties under certain circumstances.  *See id.*  However, the City goes further and argues that "the statute describes how a city is to place an encumbrance on benefited properties in order to recoup the costs of the improvements."  The City interprets the statute to mean that "the entire amount" of the costs of the improvements is "to be assessed against benefited properties."  The problem with this argument is that the detailed statutes that follow specifically address how improvement assessments are to be made -- annually.  This particular statute does not authorize the "initial assessment" approach taken by the City in this case.

The City also argues that the trial court's interpretation is "entirely illogical" and fails to take account of those property owners who chose to pay the City's "initial assessment" all at once.  In our view, however, it is the City's approach that has failed to properly account for those property owners.  At oral argument before this Court, counsel for the City was asked about homeowners who prepaid the City's "initial assessments" and what happens if later-added properties assume a share of the cost of the improvement, lowering everyone's proportional share.  The City acknowledged the potential for this happening but had no answer for how it would handle that situation.  The City suggested that the statutory scheme failed to address that scenario, but in our view, that is because the statutes do not envision the initial assessment approach taken by the City.

Finally, the City relies on the last sentence of Tennessee Code Annotated section 7-33-314 on appeal, which states, "No irregularity in the proceedings of the governing body shall exempt any benefited property from the lien for the improvement assessment, or from the payment of the assessment, or from the penalties or interest on the assessment."  Tenn. Code Ann. § 7-33-314.  Although its argument is somewhat difficult to follow, the City appears to argue that any error in its notices of liens cannot result in the benefited properties being exempt from the improvement assessment.  That is not the result of our holding in this case.  The benefited properties remain subject to annual improvement assessments and liens in accordance with the statutory scheme.  However, the benefited properties are not subject to liens in the full amount claimed by the City.  "A lien created by statute is limited in operation and effect by its terms and can be enforced only in the circumstances provided for in the legislation."  *Shelby Cty. Health Care Corp. v. Nationwide Mut. Ins. Co.*, 325 S.W.3d 88, 93 n.2 (Tenn. 2010) (citing *Phifer v. Gulf Oil Co.*, 218 Tenn. 163, 401 S.W.2d 782, 785 (1966); *Rent-A-Car Co. v. Belford*, 163 Tenn. 590, 45 S.W.2d 49, 51 (1932)).  Pursuant to Tennessee Code Annotated section 7-33-314, "Each improvement assessment, with any penalty or interest incident to the nonpayment of the assessment, shall constitute a lien upon the lot or parcel of benefited property against which it is assessed. The lien shall attach to each lot or parcel of benefited property at the time the annual improvement assessment is made[.]"

"[M]unicipalities may exercise only those express or necessarily implied powers delegated to them by the Legislature in their charters or under statutes."  *City of Lebanon*

*v. Baird*, 756 S.W.2d 236, 241 (Tenn. 1988). For all of the aforementioned reasons, we affirm the decision of the chancery court entering partial summary judgment in favor of the plaintiffs, finding that the City's notices of liens in the full amount of the total assessments were illegal and ultra vires.

### B.    Damages

The first issue raised by the plaintiffs on appeal is whether the trial court erred in denying their claims for monetary damages caused by the City's illegal liens. The plaintiffs insist that they were either denied opportunities to refinance or forced to pay the liens in full in connection with the refinancing or sales of their homes, as the amounts listed in the illegal notices of liens were so large as to potentially cloud title. The plaintiffs assert that they would not have suffered these damages had it not been for the illegal actions of the City. For instance, the plaintiffs argue that the Clarkes would have had sufficient funds to complete their refinancing if they did not have to pay "the lien in the full amount of the special assessment" at closing. They acknowledge that it was the lending institution that actually required them to pay the full amount but claim "it was only because of the fact that the City of Franklin acted *ultra vires* in the first instance by placing an unlawful lien on their property[.]" According to the plaintiffs, "[t]he fact that the City filed liens for the entire amount of the assessment instead of the annual amount, as required by the statute, resulted in the class members having to pay more than they otherwise would have to refinance or sell their homes, regardless of which entity dictated that they clear title." They acknowledge that the notices of liens stated that the liens would run with the land, but they claim that the notices of liens "effectively resulted in the property owners having to bear the entire burden of the assessment on their own if they wished to sell or refinance[.]"

In response, the City insists that "[e]ntities other than the City" required the claimants to pay the full amounts and "that is not the fault of the City." According to the City, "[m]ost, if not all of the lenders involved required the payment of the full improvement assessment amount (i.e. 'the lien') as a condition to engaging in the contemplated financial transaction, regardless of the language found in the City's Notice of Lien."

We emphasize that the trial court dismissed all eight claims for the same reason – concluding that "none of the 8 claimants had suffered an injury as a result of the City's filing notices of liens for an improper amount." According to the trial court, "none of the 8 claimants suffered an injury as a result of the City's actions." Thus, our limited inquiry at this stage is to determine whether the trial court's stated reason justified dismissal of each claim.

### 1.    Five Claims Related to Refinancing

#### a.  Jennifer and Samuel Clarke

- 17 -

As previously noted, the Clarkes claim that the lien related to the special assessment caused their refinancing application to be denied. The Clarkes had attempted to refinance their home in 2012. A title search revealed the City's notice of lien for $7,686.01, and the bank required the Clarkes to pay off the lien before closing to ensure that it had a first lien and enable it to obtain title insurance. The bank required the Clarkes to bring enough funds to closing to pay off the full amount of the lien. Eventually, their refinance was denied because of a lack of "sufficient funds to close." Thus, the Clarkes claimed $7,374.53 in damages, which was the difference between what they would have paid under the proposed refinance and what they paid under their existing payments after the denial of their application to refinance. They supported their claim with deposition testimony from Mr. and Mrs. Clarke, email communication with the lender during the refinancing process, a letter from the lender stating that their refinance was denied due to lack of sufficient funds to close, and documentation from the lender clarifying that the title examination had reflected a lien of $7,686.01 encumbering the property and the "funds" at issue meant the amount necessary "in order to pay off the lien in favor of the City of Franklin." According to Ms. Clarke, the lender was "ready to approve it until they found out about the lien." Mrs. Clarke testified that it was her understanding that "the City requires the liens to be paid off *in full* prior to a transfer of ownership." (emphasis added). Mrs. Clarke contacted two lending institutions, and both told her that a refinance would not be approved so long as the lien existed. The Clarkes had never missed a payment toward their improvement assessment.

In denying the Clarkes' claim for damages, the trial court acknowledged the letter from their bank denying their refinance application due to the lack of sufficient funds to close. Still, the trial court concluded that their claim should be denied, with the following explanation:

> The Court finds that the Clarkes suffered no injury. Their refinance application was not denied because of the City's notice of lien filing for an improper amount. [The] Bank required that the City's lien be paid in full before the refinance application was approved and title insurance obtained. Further, the Clarkes offered no evidence to show how the City's notice of lien for an improper amount caused the denial of their refinancing application. The cause of injury, if any, stems from [the] Bank's requirement that the lien be paid in full prior to refinancing, not from the City's notice of lien filing for an improper amount. The Clarkes' claim for damages is DENIED.

We respectfully disagree with the trial court's conclusion regarding the impact of the notice of lien. Throughout this proceeding, the parties have agreed that the City's improvement assessment lien arises automatically, by operation of law. *See* Tenn. Code Ann. § 7-33-314 ("The lien shall attach to each lot or parcel of benefited property at the time the annual

improvement assessment is made[.]"). Both sides have consistently agreed that it was not necessary for the City to file a "Notice of Lien" pursuant to the governing statutes.[4] Thus, in the absence of the City's filing of improper notices of liens reflecting the full amounts of the assessments that it assigned to each property, the liens would have arisen pursuant to section 7-33-314, which provides:

> *Each improvement assessment*, with any penalty or interest incident to the nonpayment of the assessment, shall constitute a lien upon the lot or parcel of benefited property against which it is assessed. The lien shall attach to each lot or parcel of benefited property at the time the annual improvement assessment is made . . . .

(emphasis added). Unlike the intended liens, which would be annually imposed and limited to the amounts of the annual assessments, the City's notices of liens provided that a lien of several thousand dollars was imposed against each property and to be paid off over a term of twenty years (or ten, depending on the subdivision). Thus, the fact that the Clarkes' bank required them to pay off the *full* amount was a direct result of the improper "Notice of Lien" filed by the City. The lien itself was not for the "full amount" claimed by the City. The trial court recognized as much in its summary judgment order in favor of the plaintiffs, wherein the trial court stated:

> Accordingly, the Court holds that the City has violated Tenn. Code Ann. § 7-33-314 by filing notices of liens in the full amount of the Assessment *because the City's liens are not for the full amount of the Assessment, the City only has a lien for the amounts due and owing annually.*

Accordingly, the trial court declared the notices of liens null and void. We simply disagree with the trial court's later finding, in its order on damages, that "the Clarkes offered no evidence to show how the City's notice of lien for an improper amount caused the denial of their refinancing application."

According to the City, "the Notice of Lien filed by the City was not the problem that any of the Plaintiffs-Appellants encountered." In fact, the City suggests that if the "Notice of Lien" was taken "out of the equation entirely," the Clarkes would have obtained the same result with their lender. The City argues that the title insurance company involved with the refinance required that the full amount be paid "regardless of the language in the Notice of Lien." We disagree. The City relies on the following language from the title

---

[4] Title 7 Chapter 33 Part 3, governing improvement assessments, has no provision regarding notices of liens. *Compare* Tenn. Code Ann. § 67-1-1403(b) (regarding tax liens, "The commissioner shall cause a notice of such lien to be recorded in the office of the county register of deeds in the county or counties in which the taxpayer's business or residence is located; or in any county in which the taxpayer has an interest in property, and such notice shall be recorded in the same manner as liens are recorded in that office.").

insurance company's commitment notice:

> Schedule B of the policy or policies to be issued will contain exceptions to the following matters unless the same are disposed of to the satisfaction of the Company:
> . . . .
> 3. Mechanics', Contractors', or Materialmen's liens and lien claims, if any, where no notice thereof appears on record.
> 4. Any facts, rights, interests, or claims which are not shown by the public record, but which could be ascertained or by making inquiry of person(s) in possession thereof.
> 5. Liens, encumbrances, or claims thereof, which are not shown by the public record.

This provision does not state that the policy would not have issued, or the refinance would not be completed, due to the existence of any of these items. It simply states that the policy would contain an exception for these matters if not disposed of to the satisfaction of the company. For example, the policy would also contain an exception for 2012 taxes, which were specifically listed as "a lien not yet due and payable." These exceptions in the commitment notice do not alter our conclusion regarding the impact of the City's notice of lien. In fact, the commitment notice supports the position of the plaintiffs. Under the separate section containing "Requirements," the commitment notice specifically provided:

> The following requirements must be met:
> . . . .
> 2. Payment and cancellation of the Notice of Lien filed on June 16, 2011 for the City of Franklin against Samuel R. Clarke and Jennifer R. Clarke of record in Record Book 5332, page 356, in the Register's Office of Williamson County, TN in the original amount of $7,686.01.

This shows that the City's notice of lien was the obstacle the Clarkes encountered that prevented them from refinancing.[5] The record does not support the trial court's conclusion that the Clarkes did not suffer "an injury as a result of the City's filing notices of liens for an improper amount."

### b. Phillip and Terri Brown

The Browns were required to pay $6,934.25 to pay off the City's lien in full in order

---

[5] The City's reliance on Mrs. Clarke's deposition testimony about her understanding of whether "the lien" caused her damages is not persuasive. When asked if her bank took issue with the "Notice of Lien" or the "actual lien," she responded, "I don't know the answer to that question. . . . Whether they made a distinction between the Notice and the lien, I don't know." She admittedly did not know if the lien would still exist if the "Notice of Lien" was lifted.

to refinance. Like the Clarkes, the trial court found that the Browns "offered no evidence to show how the improper notice of lien filing required them to pay the lien in full." The court found that "[t]he improper amount stated in the notice of lien filing had no bearing on the lender's refinancing decision." However, the Browns had submitted documentation from their lender confirming that the Browns "were required to pay *the city lien* before refinancing." (emphasis added). For the same reasons discussed above, we conclude that the City's improper notice of lien was the reason the Browns were required to pay the amount *in full*. Otherwise, the lien would have been for an annual amount.

On appeal, the City suggests that the Browns would have been required to pay the full amount anyway because, apart from a paragraph on liens, their refinancing application also required them to pay any "assessments . . . which can attain priority over this Security Instrument." The City suggests that the Browns owed the full amount of the "assessment" and would have been required to pay it in full. At the outset, we note that the "assessment" provision was not the one relied on by the lender. According to their lender, the Browns "were required to pay *the city lien* before refinancing." (emphasis added). There is nothing in the explanation from the lender to suggest that it required the Browns to pay the full amount on the basis that it was an "assessment." In any event, however, the only "assessment" that the Browns should have owed was an annual assessment. Despite the letters sent by the City to the homeowners, an annual assessment was the only assessment that was authorized by the governing statutes and established by the City's ordinances. The ordinance addressing the Monticello Subdivision, where the Browns resided, specifically provided that "improvement assessments shall be assessed annually against the benefitted property." The ordinance further provided, "Improvement assessments shall be made annually by the Board when the levy of municipal property taxes is made and *such assessments shall be due at the same time or times as the municipal property taxes are due*[.]" (emphasis added). The City points to the resolutions and ordinances for each subdivision and claims that they established "special assessments," but the terms of those resolutions and ordinances expressly stated that the authorized assessments were to be annual assessments (with the exception of the second Highgate resolution).

As such, we reject the City's argument that "the claimants *owed* the total amount of the sewer improvement assessment, regardless of any language contained in the City's Notice of Lien" and that this total "indebtedness . . . had *statutory priority*." (emphasis added). As the trial court correctly found in its summary judgment order, "the City only has a lien for the amounts due and owing annually," the full amount calculated by the City "is not due and owing" from the property owner, and the statutory scheme "only authorizes annual assessments." Moreover, regarding priority, the statute provides that the City's lien attaches "at the time the *annual* improvement assessment is made, *and then* shall take precedence over all other liens, whether created prior to or subsequent to the making of such improvement assessment, except state, county and municipal property taxes, and prior special assessments." Tenn. Code Ann. § 7-33-314 (emphasis added). Therefore, the only "assessment" that could have attained "priority," which the Browns might have been

required to pay under the loan application, would be an annual improvement assessment.

On appeal, the City seems to suggest that the trial court erred by considering issues beyond "the Notice of Lien itself." The City contends that the plaintiffs "did not challenge the assessment itself" and that the legality of the assessments was not before the trial court. We are not persuaded. Throughout this proceeding, the plaintiffs have argued that the City's lien program was illegal and ultra vires because of the way the City calculated an improvement assessment. Their complaint sought a declaration that "the City's imposition of a lien in the full amount of the special assessment violates T.C.A. § 7-33-301, *et seq*.," and "is ultra vires." They asserted that the City had obtained the illegal liens "through" and "as a result of" the special assessments. The complaint alleged that improvement assessments can only be made "each year" and "assessed annually." It alleged that "the City cannot attach a lien on property for which future annual assessments have not yet been made, and is therefore prevented from imposing a lien on a property for the full amount of the special assessment." The plaintiffs sought an injunction prohibiting the City from "maintaining a lien in the full amount of the assessment" and requiring any future liens to be limited to annual liens authorized by the statutes. In their motion for class certification, the plaintiffs proposed that the class encompass residents who were subject to "unlawful liens . . . for special sewer assessments that are not yet due under applicable statutes." They explained that they were asking the court to "direct Defendant City to operate its special assessment process differently, as required by law." Similarly, the plaintiffs sought summary judgment on the basis that the City's "lien program related to its special assessment districts" violated the statutory scheme, emphasizing that "by definition, improvement assessments are annual assessments," and the statutory scheme "only authorizes annual assessments." They argued that the City acted illegally by filing liens "in the full amount of the initial Improvement Assessments instead of the annual amounts due and owing each year." The plaintiffs argued that the statute empowered the City "to obtain an _annual_ lien against a property for the _annual_ amount of a special assessment, [but] it does not empower the City to obtain a lien in the full amount of the special assessment[.]" We recognize that the forms used for the damage claims asked for information about damages caused by the "Disputed Lien," but that term was a "tag" specified to mean the lien filed by the City "related to" the special assessment. The plaintiffs' brief on damages similarly asserted that each claimant's damages were "directly the result of the Disputed Liens," but "Disputed Lien" was again defined to mean "the liens on the property in the full amount of the 'special assessments[.]'"

Tennessee Code Annotated section 7-33-314 provides that "[e]ach improvement assessment . . . shall constitute a lien." So, it was necessary to determine the proper nature and extent of an "improvement assessment" in order to determine the proper nature and extent of the lien. One depended on the other. The trial court's summary judgment ruling properly and necessarily considered both issues. As the City recognizes in its brief, "the Trial Court issued an Order holding . . . that not only were the Notices of Lien filed on the benefitted properties in violation of state law," but also, "[t]he trial court further held that

the City possessed only a lien, as distinct from issues surrounding the Notice of Lien itself, in the amount of a given property's *annual assessment*[.]" (emphasis added). The plaintiffs' challenge extended to the assessment, so the trial court properly and necessarily concluded that the statutory scheme "only authorizes annual assessments" and "the full amount is not due and owing" from the property owner.

For these same reasons, the City's reliance on the Browns' title insurance commitment fails, as it only required the Browns to pay "assessments, levied and assessed against [the] subject premises, which are due and payable." Based on the statutes and the Monticello ordinance, the full amount to be paid over twenty years was not due and payable. Thus, we reject the City's argument that these documents would have required the Browns to pay the full amount even in the absence of any notice of lien. The problem was the notice of lien listing the full amount. The commitment notice specifically required resolution of the "Notice of Lien in favor of City of Franklin for sanitary sewer improvements of record[.]"

### c. Brandon Bubis

Claimant Brandon Bubis had his refinancing delayed after the bank discovered the lien placed by the City and required that it be paid in full prior to closing. He paid the lien of $5,850.33 in full, and the refinance was eventually completed, but Mr. Bubis claimed that the delay of several months resulted in him incurring additional damages due to an increased interest rate at closing, additional points, time off work, etc. According to Mr. Bubis, he and his wife went to scheduled closings on three occasions, but each time, they could not close due to the lien. Including the amount of the lien, he sought a total of $46,461. He submitted documentation from his lender addressing "a sewer lien on your title work" and the need to either pay it off or have it released by the City. An email from the lender during the process described the lien as "a HUGE hurdle since the lien is $7000+." Mr. Bubis also submitted a subsequent email from his lender confirming that Mr. Bubis was attempting to refinance, but "[u]pon discovering the sewer lien placed on the home by the City of Franklin, TN after the loan was in our closing department, we were unable to close. The lien needed to be satisfied prior to our loan closing." Regarding the claim filed by Mr. Bubis, the trial court again reasoned that "the City's notice of lien filing for an improper amount did not cause him injury" because "Mr. Bubis was required to pay the lien in full as a condition of his refinancing." For the same reasons discussed with respect to the previous claimants, we disagree and find that the erroneous notice of lien was the problem that led to Mr. Bubis being required to pay the full amount calculated by the City.

The City again argues that Mr. Bubis would have been required to pay the "assessment" in full regardless of the Notice of Lien because the relevant documents provided that the borrower would pay at closing "assessments . . . which can attain priority over this Security Instrument." The City argues, "Under Tennessee law, the claimants

owed the total amount of the sewer improvement assessment, regardless of any language contained in the City's Notice of Lien. That indebtedness itself, and particularly the fact that it had statutory priority over other debts, caused those entities to take issue with regard to potential financial transactions." Again, there is nothing in the explanation from the lender showing that it required Mr. Bubis to pay the full amount on the basis that it was an assessment. The documents repeatedly referenced the lien. We do recognize that Mr. Bubis appears to be the only claimant who resided in the Highgate Subdivision, where the City's second resolution purported to establish a "total assessment" that was "due February 28, 2010," but at the same time, payable over a ten-year term with payments that would be "due and payable" each month. Still, the governing statutes only provided for "[a]nnual improvement assessments" that were "due at the same time, or times, the municipal property taxes are due." Tenn. Code Ann. § 7-33-313. Pursuant to the governing statutes, the City's lien attaches "at the time the *annual* improvement assessment is made, *and then* shall take precedence over all other liens, whether created prior to or subsequent to the making of such improvement assessment, except state, county and municipal property taxes, and prior special assessments." Tenn. Code Ann. § 7-33-314 (emphasis added). Accordingly, we reject the City's argument that its "total assessment" calculation was authorized by the statutes or "had statutory priority" such that it would have to be paid in full under the terms of the refinancing documents.

### d. Michael and Laura Smith

Claimants Michael and Laura Smith were also required to pay the City's lien in full as a condition of their refinance, and the lien of $8,009.16 was paid at closing with the proceeds of their new loan. Because they "rolled it into their new mortgage," they sought to recover the interest they would owe as a result. According to Mr. Smith, "everything was approved" with their refinance until the bank ran the title search and found the City's assessment lien. He said the bank "refused to allow a refinance with that lien" and required them to pay it in full in order to clear the title. They submitted a letter from their lender confirming that "the lien" that was recorded by the City had to be paid "in full" from the proceeds of the loan as "a condition of the refinance."[6] For the reasons already discussed, we once again reject the trial court's conclusion that "the City's notice of lien filing for an improper amount did not cause the Smiths' damages." It is the reason they were required to pay the lien in the full amount.

### e. Melinda and Andrew Pulliam

Claimants Mr. and Mrs. Pulliam sought to refinance in 2012, but their application was denied due to title issues. They provided a letter from their lender regarding their

---

[6] During the refinancing process, the City had written a letter to the Smiths' lender explaining that the City had sent letters to the homeowners "stating what their assessment would be and monthly installments."

application, which explained:

> During the processing of the application, we discovered there was a lien placed on your property and against Andrew P[u]lliam and Melinda P[u]lliam by the City of Franklin. We received a sewer assessment judgment and determined the lien was placed for the cost of installing a neighborhood sanitary sewer. You were provided the option to pay for the service upfront or in 20-year amortized installments, and you select[ed] the installment payment option. Based on this payment option selection, the City of Franklin placed a lien on your property for the cost of the full assessment value.
>
> During the processing of the application, you contacted the city to inquire if they could either subordinate the lien or provide a lien waiver, and you informed us both options were denied. On August 27, 2012, the processing of your application was officially cancelled per your request due to the lien on the property.

From the limited information in the record before us, we cannot definitively determine whether the City's notice of lien, listing the improper amount, resulted in the Pulliams being unable to refinance. There is no mention of whether the Pulliams were given the option of paying off the lien in full and were unable to do so, like the Clarkes. The letter references the lien for "the full assessment value," and the attempts to have the lien either subordinated or waived, but it is not clear whether the lender's problem was with the mere existence of any lien, even the type envisioned by the statute. The documentation submitted by the Pulliams indicates that they attempted to refinance again after the City was ordered to file amended notices of liens, and their application was again denied. The letter from the lender states that it "c[a]me across the aforementioned title issues that were present within [their previous application]," contacted the City, and learned that residents now only have the ability to pay off annual installment amounts for the present year, with a new installment lien being placed on the title each year. "Due to the title issues still being present by not being able to subordinate the lien, obtain a lien waiver *or payoff the entire lien amount*," their second application was denied due to "title issues."

The trial court's findings regarding the Pulliams were scarce. Using the same language it used for many of the other claimants, it stated:

> The Court finds that the Pulliams suffered no damages because of the City's notice of lien filing for an improper amount. The Pulliams' Purchase and Sale Agreement required them to "pay all special assessments prior to or at closing." This requirement has no bearing on the City's notice of lien filing for an improper amount. Further the Pulliams offered no evidence to show how the City's notice of lien filing for an improper amount caused the denial of their refinancing application.

It is unclear from the record why the trial court referenced a "Purchase and Sale Agreement," as the Pulliams were claiming damages related to their inability to refinance. From the limited submissions and findings before us, we are simply unable to say that the Pulliams' claim should be dismissed.

## 2. Three Claims Related to Home Sales

### a. Amy Heimermann

Claimant Amy Heimermann paid the City's lien in full, which totaled $9,559.31, prior to listing her house for sale at the direction of her realtor. Her realtor informed her that she would have to pay the lien prior to selling the property in order to "clear any clouds on the title," release the lien, and be competitive in the housing market. According to her realtor, "a lien is a cloud on the title" that must be paid off in order to deliver clear title. He said, "[t]o bring a property on the market with this type of lien and cloud on the title puts the seller at an extreme disadvantage and creates fear for the buyer via added liability beyond the value of the property they are buying." Ms. Heimermann obtained a loan to pay off the lien and incurred additional closing costs in relation to that loan. She sought a total of $16,660.90 in damages. The trial court found that she made the decision to pay the lien in full in order to be competitive in the housing market and offered "no evidence showing that the City's notice of lien filing for an improper amount was the reason she paid the lien in full prior to selling her home." We again disagree with this finding. The only reason Ms. Heimermann would have paid the outstanding sum *in full* prior to selling her home was because the City's notice of lien stated that the full amount was an encumbrance on her property. For the reasons discussed above, the annual lien (and annual improvement assessment) should have been for a far less amount.

The City contends that the sales contract ultimately executed by Ms. Heimermann when she sold her home required payment of any special assessments that were "approved or levied" prior to the closing date, and this language would have required her to pay the full amount calculated by the City. We disagree. There was no statute, resolution, or ordinance that "approved or levied" an assessment for the full amount calculated by the City.

### b. Leslie Gregory Lewis

Mr. Lewis had to pay $7,262.64 to pay off the City's lien in full at the closing of the sale of his home. According to Mr. Lewis, he had been unable to refinance because of the lien, so he had to sell. He then had several offers "fall through" because of the lien. When he eventually sold the home, he was required to pay off the lien at closing. He was told that the sale "couldn't close" until the lien was paid. Mr. Lewis believed that the buyer should have been responsible for paying the remainder of the lien balance. He submitted

a letter from his realtor stating that his property was in a desirable location and should have sold quickly, but "it took about 5 months and 4 offers to close the sale." She explained that they had to disclose the sewer assessment lien and that the lien would have to be paid at closing, and buyers were also concerned about hooking up to the sewer system. She stated that Mr. Lewis had to pay "the lien in full" at closing. The trial court again found no evidence that the City's improper notice of lien was the reason Mr. Lewis paid the lien in full. For the same reasons previously discussed, we cannot agree.

### c. Donna and Joe Rand

Claimants Donna and Joe Rand were also required to pay the City's lien in full at closing, in the sum of $6,938.94. The sales contract provided that the sellers were responsible for paying all existing liens at closing. The Rands claimed that they had no choice but to pay the outstanding lien in full. The trial court found that the sales agreement required the Rands to pay all liens at closing and that "the Rands did not proffer any evidence to show that [the] City's notice of lien filing for an improper amount required them to pay the lien in full." Once again, for the same reasons, we conclude that it did.

### 3. Summary of Damage Claims

In summary, the trial court reviewed the parties' briefs and concluded that a damages hearing was unnecessary, finding that "none of the 8 claimants had suffered an injury as a result of the City's filing notices of liens for an improper amount." We have determined that this conclusion was erroneous. From our review of the record, though, it is not clear to us whether the parties and the trial court would have proceeded with a full evidentiary hearing had the trial court not announced that "a damages hearing was unnecessary." As such, we deem it appropriate to remand the damage claims to the trial court for further consideration to determine whether the claimed damages were otherwise properly recoverable. The trial court may decide the claims on the written materials submitted, or it may hold an evidentiary hearing, in its discretion. We simply hold that the trial court erred in dismissing all of the claims on the basis that "none of the 8 claimants suffered an injury as a result of the City's actions."

### C. Attorney Fees

The remaining issue raised by the plaintiffs was whether the trial court erred in denying their request for attorney fees. In light of our conclusion that all of the claims for damages must be remanded for further consideration, we deem it premature to consider any issue regarding an attorney fee award at this juncture. We therefore vacate the trial court's holding on attorney fees and direct the trial court to reconsider the issue as part of the proceedings on remand. *See, e.g.*, *Cartwright v. Jackson Cap.*, No. W2011-00570-COA-R3-CV, 2012 WL 1997803, at *16 (Tenn. Ct. App. June 5, 2012) ("[G]iven the issues in this case and the fact that we are remanding for further proceedings, we believe that it

would be premature for us to determine at this point who should be responsible for the parties' attorneys' fees."); *Danelz v. Gayden*, No. W2010-02308-COA-R3-JV, 2011 WL 2567742, at *9 (Tenn. Ct. App. June 29, 2011).

## IV. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is affirmed in part, reversed in part, vacated in part, and remanded for further proceedings. Costs of this appeal are taxed to the appellee, City of Franklin, for which execution may issue if necessary.

_____

CARMA DENNIS McGEE, JUDGE